RICHARD G. WAGNER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4265.   Promulgated December 27, 1927.

*Ben A. Matthews, Esq.*, for the petitioner.
*S. Duffield Mitchell, Esq.*, for the respondent.

OPINION.

ARUNDELL: The parties to this proceeding have filed a stipulation reading as follows:

> If such seizure resulted in a loss to the taxpayer, such loss was in excess of the income received by the taxpayer during that year, and if deductible under the law the taxpayer received no net income during that year which would subject him to tax.

The Commissioner's position is that a seizure by the Alien Property Custodian under the facts set forth in the findings is not such a taking as would entail-passage of the general title to the property and consequently title remained vested in petitioner until he assigned his interest to Jensen in 1921 and no determinable loss was sustained until that time. If the question as framed by the Commissioner is determinative, we feel that his position would have to be sustained, for while the powers granted to the Alien Property Custodian were exceedingly broad under the Trading with the Enemy Act,[1] we do not feel that they were sufficiently broad to vest in him the absolute title to the property seized. In the case of *In re*

[1] The pertinent parts of the Trading with the Enemy Act are as follows:

Section 6 (40 Stat. 415). That the President is authorized to appoint, prescribe the duties of * * * an official to be known as the Alien Property Custodian who shall be empowered to receive all money and property in the United States due or belonging to an enemy or ally of enemy which may be paid, conveyed, transferred, assigned or delivered to said custodian under the provisions of this Act; and to hold, administer, and account for the same under the general direction of the President and as provided in this Act. * * *

Section 7 (c). If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of. or for the benefit of an

*Gregg's Estate*, 266 Pa. 189; 109 Atl. 777 (certiorari denied, 252 U. S. 588), it is said:

The Trading with the Enemy Act is not for confiscation of property. It is rather for its conservation. While if the President so direct, the money or property of an alien enemy may be taken by the government for its own purposes, the owner does not part absolutely with it. For after the end of the war his claim to it "shall be settled as Congress shall direct * * *."

In the case of the *United States* v. *Chemical Foundation* (Dist. Ct.), 294 Fed. 300 (affd. C. C. A., 5 Fed. (2d) 191, and 272 U. S. 1), it is said:

Yet it is of course true that neither the President nor the custodian is the owner of enemy property. "As though he were the absolute owner" was inserted in the Act merely to state the extent and scope of the grant of additional power—not to confer upon the President or custodian personally the beneficial interest in the property. Hence, in the sale of enemy property all officers act in an official or fiduciary capacity.

---

enemy or ally of enemy, * * * shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian.

Section 9. That any person, not an enemy, or ally of enemy, claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, * * * may file with the said Custodian a notice of his claim; * * * and the President, if application is made therefor by the claimant, may, * * * order the payment, conveyance, transfer, assignment or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the President shall determine said claimant is entitled. * * * If the President shall not so order within sixty days after the filing of such application, or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may * * * institute a suit in equity in the district court of the United States * * * (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if suit shall be so instituted then the money or other property of the enemy, or ally of enemy, against whom such interest, right or title is asserted, or debt claimed, shall be retained in the custody of the Alien Property Custodian, or in the Treasurer of the United States, as provided in this Act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant or by the Alien Property Custodian or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant, or suit otherwise terminated.

Section 12. (As amended by 40 Stat. ch. 26, p. 460) That all moneys * * * paid to or received by the Alien Property Custodian pursuant to this Act shall be deposited forthwith in the Treasury of the United States * * *.

All other property of an enemy or ally of enemy conveyed, transferred, assigned, delivered or paid to the alien property custodian hereunder shall be safely held and administered by him, except as hereinafter provided * * *.

The Alien Property Custodian shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which has been or shall be * * * required to be conveyed, transferred, assigned, delivered, or paid over to him in pursuance of the provisions of this Act, and, in addition thereto, acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership in like manner as though he were the absolute owner thereof * * *.

The above cases, it will be noted, involve property where the claimant's recovery was required by the terms of the act to be postponed until " after the end of the war " (Sections 10 and 12 of the Trading with the Enemy Act). One " not an enemy or ally of the enemy," however, was in a much more favorable situation. Under section 9 of the Trading with the Enemy Act he could immediately upon the seizure of his property, file a claim with the Alien Property Custodian to establish his interest therein, or at will bring suit in equity to establish his right thereto, and should he prevail in either proceeding, provision was made for the issuance of an order requiring the Custodian to deliver to him the seized property to the extent of his interest. That section 9 *supra* served to safeguard petitioner's rights is apparent from the Supreme Court's decision in *Stoehr* v. *Wallace*, 255 U. S. 239, 245, wherein it is said:

> The present act commits the determination of that question [enemy ownership] to the President, or the representative through whom he acts, but it does not make his action final. On the contrary, it distinctly reserves to any claimant who is neither an enemy nor an ally of an enemy a right to assert and establish his claim by a suit in equity unembarrassed by the precedent executive determination. Not only so, but pending the suit, which the claimant may bring as promptly after the seizure as he chooses, the property is to be retained by the Custodian to abide the result and, if the claimant prevails, is to be forthwith returned to him. Thus there is provision for the return of property mistakenly sequestered; and we have no hesitation in pronouncing it adequate, for it enables the claimant, as of right, to obtain a full hearing on his claim in a court having power to enforce it if found meritorious.

We thus find that not only was the Alien Property Custodian not the owner of the seized property, but that an adequate opportunity' was given by law to the petitioner to establish his ownership, and during the pendency of such proceedings the property was required to be held in the hands of the Custodian.

But we do not think that this is decisive of the question. It is not always necessary that title be lost before a deduction is allowable. For instance, the revenue statutes specifically recognize losses by theft and yet the owner does not lose title to stolen goods. While ordinarily the rule may be sound that a loss to be allowable under the statute must be evidenced by a closed and completed transaction, we have as authority the Supreme Court that one need not be an incorrigible optimist in order to secure a loss under the Revenue Acts. *United States* v. *White Dental Manufacturing Co.*, 270 U. S. 398. Petitioner cites, in support of the position that a loss of possession is sufficient to warrant the allowance of a loss under the Revenue Acts, the case of *Rhinelander* v. *Pennsylvania Insurance Co.*, 4 Cranch, 28, and a number of cases in which that decision has been followed. The *Rhinelander* case involved the question of whether a

loss for the purpose of recovering insurance had been sustained where a neutral vessel was captured by a belligerent cruiser and the captured vessel abandoned by the owners to the insurers. The opinion of the court reads in part as follows:

It is, therefore, the unanimous opinion of the court that where, as in this case, there is a complete taking at sea by a belligerent who has taken full possession of the vessel as a prize and continues that possession to the time of the abandonment, there exists in point of law a total loss. * * *

Concerning captures at sea, Mr. Justice Story in the case of *The Star*, 3 Wheat. 78, 85, said:

It is admitted on all sides by public jurists that in cases of capture, a firm possession changes the title to the property; and although there has been in former times much vexed discussion as to the time at which this change of property takes place * * * it is universally allowed that at all events a sentence of condemnation completely extinguishes the title of the original property and transfers a rightful title to the captors or their sovereign.

The case books are replete with decisions relating to war-time seizures of vessels, but as they treat largely of admiralty law and international law as applied to seizures, most of them are beside the mark. Here we are concerned only with two pieces of statutory law—the Trading with the Enemy Act and the Revenue Act of 1918—and if (as stipulated by the parties) the seizure under the former gives rise to a loss recognized by the latter, we have an end to our problem.

We do not care to go, however, so far as to hold that in all cases an illegal seizure by the Alien Property Custodian of a citizen's property would, as a matter of law, give rise to a deductible loss under the revenue statutes. The temporary sequestration of property, followed by its return intact (even though the return be in a later year), may well indicate that in fact no loss was suffered.

The situation present in the instant case is extraordinary. Ordinarily, in determining whether income is realized or deductions are allowable we view the facts as they exist during the taxable year. It has been said that such a course is impelled by administrative necessity. But in the extraordinary case we feel that a broader view may be necessary. In the case of *Bowers* v. *Kerbaugh Empire Co.*, 271 U. S. 170; 46 Supreme Court Reporter 449, the Supreme Court viewed the entire transaction through a series of years and found that a loss had been sustained rather than taxable income realized. In the case of *Forstmann* v. *Ferguson*, 17 Fed. (2d) 659; 6 Am. Fed. Tax Rep. 6530, the Commissioner sought to compel the return as income in one year of the entire amount of dividends, impounded over a series of years as the result of suits by the Alien Property Custodian, and released to the taxpayer within the year, but under such facts the court held that the income should be

returned as and for the years in which the taxpayer would have received it but for the interposition of the Government.

So here, we feel warranted in viewing all the facts. Within the year the petitioner has been illegally dispossessed by the Government of his property, including the income now sought to be taxed. The Government at the time charged that both the principal and the income were enemy owned and that the income now sought to be taxed was not the income of petitioner, but of an alien enemy. Along with his property the Government seized his records. Under such circumstances he made no return, but awaited the outcome of the proceedings. Property of a value of $5,000,000 when seized had shrunk in value by the year 1921 to $1,500,000 and what is left is turned over to a creditor in payment of the balance due on the purchase price of the property seized. Petitioner has lost $3,500,000 in the transaction. To hold that petitioner is in receipt of income under such circumstances offends both reason and morals. Considering the transaction as a whole, as under the facts here we must, petitioner had no net taxable income for the year 1918.

Reviewed by the Board.

*Judgment will be entered for the petitioner.*

TRAMMELL and PHILLIPS dissent.